**COLUMBIA GAS OF PENNSYLVANIA, INC. and the Manufacturers Light and Heat Co., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 68–476.**

United States District Court, W. D. Pennsylvania.

March 31, 1970.

Albert McBride, Jr., Senior Atty., Pittsburgh, Pa., for plaintiffs.

Richard L. Thornburgh, Pittsburgh, Pa., David A. Wilson, Jr., Chief, Refund Trial Section No. 1, U. S. Dept. of Justice, Washington, D. C., for defendant.

### OPINION

GOURLEY, Senior District Judge.

This is a civil action filed against the United States to recover documentary stamp taxes paid by plaintiffs in or about January of 1962. Claim for refund was filed with the District Director of the Internal Revenue Service on October 21, 1964. The claim for refund was disallowed, and plaintiffs filed this suit for refund on April 26, 1968. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1346(a) (1).

The parties entered into a substantial Stipulation of Facts, Exhibits were filed, and the case was tried non-jury by this member of the Court. Upon hearing, counsel for the respective parties disput-

ed the relative importance of the Exhibits and the Court thereupon requested proposed Findings of Fact and Conclusions of Law. The Court has fully reviewed the record and is of the opinion that plaintiffs should prevail.

The essential facts are these. Plaintiffs Columbia Gas of Pennsylvania, Inc. (hereinafter Penn) and The Manufacturers Light and Heat Company (hereinafter Manufacturers), are Pennsylvania corporations and are wholly owned subsidiaries of The Columbia Gas System, Inc. (hereinafter System). System is a Delaware corporation registered as a public utility holding company under the Public Utility Act of 1935, Ch. 687, 49 Stat. 803 and is in the business of owning and holding corporate stock in various operating companies.

Prior to 1962, System owned stock in more than thirty subsidiary operating companies which were engaged both in the combined transmission and wholesale sale of natural gas in interstate commerce and also in the intrastate retail distribution of natural gas in various states. Many of the subsidiaries consequently were subject both to the regulatory authority of the Federal Power Commission and to the regulatory authority of one or more State Public Utility Commissions. Since the requirements of the Federal and State regulatory authorities were by no means identical, System's subsidiaries were subject to expensive and complex corporate, regulatory and accounting problems.

Plaintiff Manufacturers was such a subsidiary confounded by the multiplicity of regulatory bodies to which it was subject, those being the Federal Power Commission and the Public Utility Commissions of the States of Maryland, Ohio, Pennsylvania and West Virginia. In 1960, System began a first step in reorganizing the corporate structure of Manufacturers and created a shell corporation, Penn, with the intention that Penn would receive those assets of Manufacturers utilized in the intrastate distribution of gas in the State of Pennsylvania.

The overall purposes of this and other similar reorganizations planned by System were (a) to realign the assets and facilities of System's subsidiaries in order that a given subsidiary would contain only assets and facilities for the intrastate retail distribution of natural gas used in a given state, thus subjecting the intrastate commerce of the given subsidiary to the regulatory jurisdiction of the Public Utility Commission of that state alone, (b) to eliminate expensive and complex corporate, regulatory, and accounting problems that existed within the corporate organizations, and (c) to lower costs of corporate administration.

In accordance with these objectives, Manufacturers transferred to the shell corporation Penn, on January 1, 1962, its tangible and intangible assets used in the intrastate distribution of natural gas in Pennsylvania. In consideration, Penn issued 1,447,518 shares of its $25 par value common stock to Manufacturers. Immediately subsequent to the issuance of said shares by Penn to Manufacturers, Manufacturers exchanged said shares for 537,279 shares of its own $50 par value stock held by System. Upon receipt of the 537,279 shares of its own $50 par value stock, Manufacturers retired these shares.

System, at all relevant times, has been a 100% owner of both Manufacturers and Penn. After the transaction described in the aforementioned paragraph, the sum total of Manufacturers' and Penn's assets, capital stock, indebtedness, and capital surplus was equal to that of Manufacturers before the reorganization, and no change in the shareholder ownership of System resulted from the reorganization.

System has filed and continues to file a consolidated federal income tax return whereby all the subsidiary companies are consolidated into one company for the purpose of federal income tax. The January, 1962 transaction between Manufac-

turers and Penn was ruled by the Treasury Department to be a Section 368(a) (1) (D) reorganization under the Internal Revenue Code, and no *income* tax consequences were incurred by System, Manufacturers, or Penn as a result of the realignment transaction.

However, in connection with the issuance of shares by Penn to Manufacturers, Penn purchased documentary stamp taxes in the amount of $36,188, representing ⅒th of 1% of $36,187,950, the par value of the shares issued. Manufacturers on January 30, 1962, purchased documentary stamps in the amounts of $14,-475.20, representing 4 cents per $100 or fractional part thereof, on the par value of the Penn shares transferred from Manufacturers to System. In connection with the conveyance and assignment of real property by Manufacturers to Penn, Manufacturers purchased and affixed to the deeds documentary stamp taxes in the amount of $2,598.10, representing 55 cents per $500 or fractional part thereof, of the value of the realty conveyed.

Plaintiffs claim that the documentary stamp taxes were erroneously paid because the transaction was within the excise tax exemption enacted as part of the Excise Tax Technical Changes Act of 1958 and set forth in Section 4382(b) (1) (D) of the Internal Revenue Code of 1954. That provision reads as follows:

"§ 4382 Exemptions.

(b) Certain reorganizations, etc.

The taxes imposed by sections 4301, * * * 4321, * * * and 4361 and shall not apply to—

(1) Corporate and railroad reorganization.

The issuance, transfer, or exchange of securities, or the making, delivery or filing of conveyances, to make effective any plan of reorganization or adjustment—

(D) whereby a mere change in identity, form, or place or organization is effected, * * *."

Fundamental cases in the interpretation of Section 4382(b) (1) (D) are Co-lumbia Gas of Maryland, Inc. v. United States, 366 F.2d 991, 177 Ct.Cl. 97 (1966) and Cabot Corp. v. United States, 220 F. Supp. 261 (D.Mass.1963), aff'd per curiam, 326 F.2d 753 (1st Cir. 1964). On facts not dissimilar to those before me, the majority of the Court in *Columbia Gas of Maryland, supra,* held that the reorganization was one of substance and not "a mere change in identity, form, or place of organization." In stating the majority opinion, Judge Laramore interpreted the above-quoted phrase narrowly and reasoned that the absence of a change in ownership in a reorganization did not conclusively demonstrate that the change was one of identity, form or place rather than one of substance.

However, in a dissenting opinion, Chief Judge Cowen pointed to legislative history which strongly suggests that a lack of change in ownership was intended to be a conclusive indicia of a reorganization involving "a mere change in identity, form, or place of organization" within the meaning of Section 4382(b) (1) (D). At 366 F.2d 997, Chief Judge Cowen stated as follows:

"The last two sentences of the report of the Senate Committee on Finance (quoted in the majority opinion) read:

'Reorganizations involving a mere change in identity, form, or place of organization, represent merely a formalistic change and do not involve any shifts in ownership. *For that reason* [emphasis supplied], your committee has excluded such reorganizations from the issuance and transfer taxes on stocks and certificates of indebtedness as well as from the tax on the conveyance of real property. [S.Rep.No.2090, 85th Cong., 2d Sess., p. 61 (1958), 1958–3 Cum.Bull. 584, 644, U.S.Code Cong. & Admin.News 1958, P. 4454.]'

The fact that 'that reason' is singular suggests to me that the phrase 'represent merely a formalistic change' is in apposition to the phrase 'do not involve any shifts in ownership.' If the two phrases were intended to have dif-

ferent meanings, I think the Senate Committee on Finance would have said 'those reasons.'"

In the case before the Court, it is clear that the creation of Penn and transfer of assets from Manufacturers to Penn resulted in no change of ownership, since System at all times has been the 100% owner of both subsidiaries. Even if this fact is not conclusive in demonstrating that the reorganization was one of form rather than substance, the Court finds that, other facts considered, the Manufacturers—Penn—System reorganization was one of form only.

It is significant that the transfer of assets from Manufacturers to Penn was substantially in avoidance of multiple State Public Utility Commission regulation of a single corporation; that the reorganization was afforded tax free status for federal income tax purposes and that, subsequent to reorganization, Penn and Manufacturers reported income consolidated with that of System to the Internal Revenue Service, thus eliminating the possibility of future intercorporate transfers to achieve tax objectives. These facts support the conclusion that the reorganization was one of form and not substance.

The Court is not swayed by the fact that, before the Federal Power Commission would approve the sale of Manufacturers' assets to Penn, Manufacturers was required to seek a Certificate of Public Convenience and Necessity authorizing the construction and operation of 20 new measuring and regulating stations in Pennsylvania at a cost of $389,000. I fail to see how Penn's ultimate compliance with those construction requirements imposed by the Federal Power Commission as a prerequisite to the transfer of assets from Manufacturers to Penn would alter the fundamental character of the originally intended reorganization.

The *Cabot* case, *supra*, compels no different result. In that case, unlike the instant one, a clear shift in the substantive rights of shareholder ownership resulted from the reorganization.

In accordance with the foregoing opinion, judgment will be entered in favor of plaintiffs and against the Government. An appropriate Order is entered.